*In re* MARRIAGE OF ANDREINA E. GORDON, a/k/a Andreina Floreani, Petitioner-Appellant, and ROBERT T. GORDON, Respondent-Appellee.

First District (6th Division)   No. 1—91—2507

Opinion filed August 14, 1992.

620

William J. Harte, Ltd., of Chicago (William J. Harte, Silvia A. Sotiras, and Joan M. Manniz, of counsel), for appellant.

Marc D. Ginsberg, Patricia C. Nowak, and Edward P. Dismukes, all of Rooks, Pitts & Poust, of Chicago (Kirsch, Berman & Hoffenberg, Ltd., Mammas & Goldberg, Ltd., and Stamos & Trucco, of counsel), for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

In *May v. Anderson* (1953), 345 U.S. 528, 533, 97 L. Ed. 1221, 1226, 73 S. Ct. 840, 843, which involved a dispute between a divorced couple over child custody, the Supreme Court described the rights of a mother "to the care, custody, management and companionship of her minor children" as "[r]ights far more precious *** than property rights." In this case the rights of a 24-year-old mother to the care, custody and management of her 35-month-old son, who had been in her custody since his birth, were stripped from her by an order of the circuit court. They were first stripped from her without giving her the right to utter a single word in her own defense. The first order, entered *ex parte*, gave "uninterrupted visitation" and "possession" of the child to the natural father. That order was extended over a six-month period during which hearings were conducted in which the mother was permitted to be heard; but the judge "extended" the order, granting to the natural father what is now conceded to be cus-

tody, although then called "physical care and possession," until further order of the court. In this appeal the mother insists that the "extended" order is contrary to the manifest weight of the evidence, that her due process rights were violated by the *ex parte* hearing and order, that improper evidence was admitted and proper evidence was excluded. We dismiss the appeal from the *ex parte* order, and we reverse the order extending the *ex parte* order.

Robert Gordon (Robert) and Andreina Floreani (Andreina) were married on September 5, 1987; Robert, a physician, was 37 years old and Andreina, a college student, was 21 years old; Andreina was pregnant at the time. They separated about one month later. On November 18, 1987, Andreina filed a petition for dissolution of marriage. On February 8, 1988, their child, Andrew, was born. Robert denied that he was the father of Andrew and requested that blood tests be administered. Those tests later established that Robert was the father, and he admitted paternity.

On December 28, 1988, a judgment for dissolution of marriage was entered which incorporated a written settlement between the parties. Both parties agreed that the child was to be adopted by Andreina's parents, Dr. Evan Floreani and Maria Floreani. Robert acknowledged that upon his consent to adoption he would have no rights or obligations with the child which meant that he would "probably have no future contact with the child for the rest of [his] life nor the child with [him]." Andreina would have "sole custody of the child pending the adoption and [would] be solely responsible for his care and support." Robert would be barred from all visitation or other rights regarding the child and would not "be liable for his care and support" except for temporary maintenance and child support of $4,750 which was then due to Andreina.[1]

On April 19, 1989, Andreina filed a motion to vacate portions of the judgment for dissolution of marriage. The motion alleged that the property settlement agreement was contingent upon the adoption by Dr. and Mrs. Floreani of the child and that Dr. and Mrs. Floreani had decided not to adopt Andrew. The motion asked that all provisions of the judgment be vacated except those provisions divorcing the parties and granting custody of Andrew to Andreina. Robert filed a motion to dismiss the motion to vacate; he alleged that the settlement agree-

[1]Robert earned $150,000 yearly as a surgeon; he also had other unearned income and assets in excess of $1 million.

ment was not contingent on the adoption of Andrew by Dr. and Mrs. Floreani; and he insisted that the settlement agreement be enforced.

Andreina filed a petition for child support. Robert filed a petition for visitation and a response to the petition for child support in which he admitted that he had made no contribution toward the support of Andrew since the entry of the judgment of dissolution of marriage; he further alleged that pursuant to the terms of the settlement agreement Andreina had assumed sole responsibility for the support of Andrew. In his petition for visitation, he suggested that the court should consider whether continued custodial residence with Andreina was in Andrew's best interest. An agreed order was entered giving Robert an hour supervised visitation for four weeks at Hephzibath Children's Association, a social service agency in Oak Park, and later an hour and one-half visitation the next four weeks at Robert's home. The parties were to split the cost of Hephzibath's supervision of visitation. The judge reserved the right to consider retroactive child support.

On July 24, 1989, the judge entered an order which required Robert to pay $1,000 per month as temporary child support. The order also provided that Robert should have visitation with Andrew each Tuesday and Thursday away from Andreina's home for three hours. Mark Podolner, who worked for Hephzibath, was named in the order as the person to determine if supervision was required after one month.

On August 21, 1989, Andreina filed a petition for leave to remove Andrew to New York City, where she had obtained employment. Robert filed a response in opposition in which he asked the court to conduct a *de novo* trial to determine the best interests of Andrew. He alleged that he had established a warm and loving relationship with Andrew and asked that the permanent care, custody and control of Andrew be awarded to him.

On November 17, 1989, Robert filed an emergency petition for temporary custody of Andrew and a preliminary injunction restraining Andreina from removing the child to the State of New York or to Argentina. He alleged on information and belief that Andreina had moved to New York City and left physical custody of Andrew with her parents. Andreina moved to dismiss Robert's counterpetition on the ground that the counterpetition was barred under section 610(a) of the Illinois Marriage and Dissolution of Marriage Act (the Marriage Act) (Ill. Rev. Stat. 1987, ch. 40, par. 610(a)) in that it was filed less than two years after the order of dissolution of marriage was entered

on December 28, 1988. On December 9, 1989, the judge granted Andreina's motion to dismiss Robert's petition for custody.

On January 8, 1990, Robert filed a motion for reconsideration of the December 9 order allowing Andreina's motion to dismiss his petition for custody or, in the alternative, a motion to vacate the portion of the judgment of dissolution of marriage which related to the custody of Andrew.

On February 16, 1990, an agreed order was entered establishing visitation for Robert. It provided in part that Robert had visitation rights on alternate Saturdays and Sundays from 10 a.m. to 10 a.m. the next day; and each Wednesday from 3 p.m. until 6:30 p.m. He was to have Andrew for one week winter vacation and one week summer vacation. He was required to notify Andreina in writing giving her at least 30 days' notice of his intent to exercise such vacation and listing Andrew's itinerary, the place where he might be located and the telephone number where he might be reached with respect to the vacation. Andreina was to do the same for Robert when she would take Andrew on vacation or out of the State of Illinois for more than five days.

The agreed order provided for Robert's responsibility for certain educational costs of Andrew, maintenance of health insurance and for a policy on Robert's life in the amount of $250,000 naming Andrew as an irrevocable beneficiary. The order did not mention child support. We judge, therefore, that the order of July 24, 1989, requiring Robert to pay $1,000 per month as temporary child support was still in effect.

On March 15, 1990, the judge denied Robert's motion to reconsider the order of December 9, and he denied Robert's motion to vacate the portion of the judgment granting custody to Andreina. On the same day Andreina withdrew her petition for leave to remove Andrew from Illinois.

For the next several months, various other motions and petitions were filed by the parties dealing with matters such as attorney fees, visitation rights and petitions for rules to show cause.

On January 2, 1991, Robert filed a petition for an emergency order of protection under the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (Ill. Rev. Stat. 1989, ch. 40, par. 2311—1 *et seq.*). Attached to the petition was the affidavit of Robert in which he alleged that he was a physician specializing in pediatric heart surgery; that he had been denied visitation by Andreina; that he had observed Andrew with numerous bruises, a split lip and little scratches; that on December 2, 1990, when he returned Andrew to Andreina she

spanked Andrew when he screamed, "Daddy, help me. I'm scared"; that she then punched Andrew twice in the face; and that Andrew had consistently manifested hysteria and fear toward Andreina and had told Robert that Andreina had struck him in the face and head with her fist.

He further alleged that he had learned "recently" that Andreina planned a trip to Argentina which "has no child abduction treaty with the United States"; that Andreina's mother was from Argentina and Andreina had gone to high school in Argentina; that the "harm that the remedies sought were intended to prevent would be likely to occur" if Andreina had been given notice of the petition, which asked for injunctive relief against Andreina and that "temporary legal custody of Andrew be awarded to Robert."

The judge then conducted an emergency *ex parte* hearing without notice to Andreina. Robert, Mark Podolner, who had been appointed by the court to supervise Robert's visitations, and Dr. Phillip Helding, a child psychiatrist, testified. The judge entered a form order of emergency protection enjoining Andreina from removing Andrew from the physical care of Robert, who already had Andrew in his care. Andreina was ordered to appear on January 14, 1991, and to tender to the court Andrew's passport. The question of "temporary custody" was "reserved because no notice was given to [Andreina] but [Robert would] continue to have uninterrupted visitation until January 14, 1991, so that Andrew Gordon [would] remain in his possession." A supplemental order was also entered that day which found that Andreina had "committed physical abuse" upon Andrew, that if Andreina had been given prior notice of the proceedings it was "likely that Andrew would suffer continued abuse," that Andreina had denied visitation to Robert on at least five occasions and that the proposed three-week visitation of Andreina to Argentina with Andrew would interfere with Robert's visitation rights.

Hearings were conducted intermittently over a period of six months. Andreina and witnesses in her behalf testified. She denied the allegations that she had mistreated Andrew. Robert and witnesses in his behalf also testified. Throughout the hearings Andrew remained in the "possession" of Robert. Andreina had the right of supervised visitation.

On July 22, 1991, the judge entered an order on a preprinted form captioned "Interim/Plenary Order of Protection." However, the judge said that the matter was before him "to be heard on extension or termination of *ex parte* order of protection entered on" January 2, 1991. He concluded that the order of protection entered on January 2,

1991, "is *extended* until further order of the court." (Emphasis added.)

In the form order the printed words "temporary custody" were typed through and replaced with the typed words "physical care and possession." The order, therefore, provided that the "physical care and possession," not temporary custody, of Andrew was "awarded to Robert Gordon." Andreina was prohibited from removing Andrew from Illinois or concealing him in Illinois. She was ordered to "[n]ot remove the minor child Andrew Gordon from the physical care of Robert Gordon." The order recited, "This order shall remain in effect until further order of the court. There is no just reason to delay enforcement or appeal of this order." Andreina filed a notice of interlocutory appeal from the order of January 2, 1991, and the order of July 22, 1991, and has assigned several grounds for reversal which we will address later.

First we must consider Robert's claim that this appeal should be dismissed. He relies on Supreme Court Rule 306(a), which provides:

"(1) *** An appeal may be taken in the following cases only on the allowance by the Appellate Court of a petition for leave to appeal:

* * *

(v) from interlocutory orders affecting the care and custody of unemancipated minors, if the appeal of such orders is not otherwise specifically provided for elsewhere in these rules." 134 Ill. 2d R. 306(a)(1)(v).

Andreina contends that jurisdiction is proper under Rule 307(a), which provides:

"An appeal may be taken to the Appellate Court from an interlocutory order of court:

(1) granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." 134 Ill. 2d R. 307(a).

It is Robert's contention that the order appealed from is an "interlocutory order affecting the care and custody of an unemancipated minor" rather than an injunction order and that Andreina's failure to seek leave to appeal pursuant to Supreme Court Rule 306(a) requires that this appeal be dismissed. His contention now that this is an appeal of a custody order is diametrically opposite to the position he took in the trial court. He advisedly avoided the term "temporary custody" in the order; it was supplanted by "uninterrupted visitation" and "care and possession." On January 2, 1991, the attorney for Robert told the judge, "We are not going to ask for custody, but some other relief." On February 6, 1991, the judge said, "We are not going

into full custody at this time." On April 9, 1991, the attorney for Andreina said, without contradiction by Robert's attorney, "There was a great deal of testimony that would reflect positively or negatively upon a custody issue, but the custody of the child is not at issue at this point." One reason the term "custody" was avoided by Robert in the trial court is obvious to us. The Domestic Violence Act specifically excludes "legal custody" from the remedies available in an emergency order of protection. (Ill. Rev. Stat. 1989, ch. 40, par. 2312—17(a).) Indeed, the preprinted petition for a protective order filed by Robert expressly provides, "Temporary Legal Custody not available in Emergency Order."

We wish to make our position clear, however, that our review of all the proceedings discloses that a change of custody was the purpose of the petition regardless of how the parties may have described the proceedings in the trial court. To illustrate, Robert testified at the *ex parte* hearing that Andreina had denied his visitation rights on five occasions. He even had the judge make that finding in the supplemental *ex parte* order. The significance of that evidence is illustrated by the argument he made in support of his counterpetition for a change of custody which was denied:

> "A growing body of case law in Illinois and throughout the country recognizes interference with visitation as a significant factor *in the award of child custody* and that should be a significant factor in this case." (Emphasis added.)

In addition, when Andreina's attorney objected to questions asked of Robert which were designed to show the relationship between him and Andrew, his attorney said this:

> "May I speak to that objection, Your Honor. You are being asked to give this man possession of this child, *continued possession* of this child. I would think his relationship with his child is of the utmost importance to the Court because of this request the child be continued to be in his possession." (Emphasis added.)

Last, and most important, however, is the petition for change of custody filed by Robert after the order of July 22, 1991, had been entered. That petition, which has been provided to us by Robert's attorneys in an appendix to his brief, establishes beyond doubt that the so-called "order of protection" was in fact an order changing custody. The petition for permanent custody is factually based entirely on the finding of abuse under the Domestic Violence Act made on July 22, 1991. An affirmance in this case would be *res judicata* of the factual basis of the petition for permanent custody. For those reasons we

agree with appellate counsel for Robert that the order entered was, in substance, a custody order, but we also agree with appellate counsel for Andreina, for reasons to be explained later, that the Domestic Violence Act was misused and was a subterfuge to permit Robert to circumvent the requirements of section 610 of the Marriage Act. Ill. Rev. Stat. 1989, ch. 40, par. 610.

■■ We need not determine whether the order is appealable under Rule 307(a) because we have determined that the motion to dismiss the appeal should be denied for two other reasons. First, we believe that the action brought under the Domestic Violence Act in this case was independent of the marriage dissolution proceedings. (*Cf. In re Marriage of Blitstein* (1991), 212 Ill. App. 3d 124, 569 N.E.2d 1357 (a petition for a protective order under the Domestic Violence Act filed in a marital dissolution case is a separate claim and is not an ancillary part of the claim for dissolution).) A petition for an order of protection may be filed under the Act "by any person on behalf of a minor child." (Ill. Rev. Stat. 1989, ch. 40, par. 2312—1(b).) The fact that it was brought by Andrew's father, who was also involved in the marriage dissolution proceedings, is coincidental. The core issue was whether Andreina had physically abused Andrew and that issue was completely adjudicated. If no custody order had been entered, no one could deny that Andreina might appeal as a matter of right.

Robert has seen fit to avoid the available remedies under the Marriage Act and filed a complaint under the Domestic Violence Act. We judge, therefore, that, in determining appealability, other matters pending in the dissolution proceedings are not relevant, such as the petitions for visitation filed by Andreina's parents and particularly Robert's petition for permanent custody which was filed after the notice of appeal was filed in this case.

The cases of *In re Marriage of Leopando* (1983), 96 Ill. 2d 114, 449 N.E.2d 137, and *In re Custody of Purdy* (1986), 112 Ill. 2d 1, 490 N.E.2d 1278, do not involve the Domestic Violence Act but are analogously instructive. In *Leopando*, the trial court awarded permanent custody of a child to the father but reserved for future consideration the issues of maintenance, property division and attorney fees. The custody order stated that there was no just reason to delay enforcement or appeal of the order. The supreme court held that a "custody order [did not constitute] a final judgment as to a separate claim in a dissolution proceeding" and, therefore, was not appealable. (96 Ill. 2d at 118.) It is clear to us that implicitly the supreme court held that the custody order was appealable if all other material issues had been adjudicated.

The supreme court later made what was implicit in *Leopando* explicit in *Purdy* in which child custody had been granted to the mother pursuant to a judgment of dissolution of marriage. Four years later the father filed a petition for change of custody alleging that the mother could no longer care for the child because of the mother's debilitating illness. The trial judge allowed the petition and granted the mother reasonable visitation on alternating weekends, but reserved ruling on the mother's summer visitation rights. The order also recited that there was no just reason to delay enforcement or appeal.

The appellate court dismissed the appeal, relying on *Leopando*. In reversing the dismissal order of the appellate court, the supreme court distinguished *Leopando*, saying this:

> "The issue of custody arises here not as a matter ancillary to the issue of dissolution or any other issue, but rather as a result of the father's post-dissolution petition for a change of custody. The petition sought a change of custody, and the petition was granted. *An order for a change of custody in this context constitutes a final, and therefore appealable, order.* *** The fact that the circuit court reserved ruling on the mother's summer visitation does not render the change-of-custody order interlocutory. 'A decree is final if *** the matters left for future determination are merely incidental to the ultimate rights which have been adjudicated by the decree.' [Citations]." (Emphasis added.) *Purdy*, 112 Ill. 2d at 5.

The posture of this case is the same as that of *Purdy*. In fact, the position of Andreina with respect to appealability is stronger than the position of the appellant in *Purdy* because there is nothing further pending in the complaint brought under the Domestic Violence Act. Our conclusion is not affected because the order of custody provided that it was in effect "until further order of the court." One court may transfer jurisdiction to another court under certain circumstances. (*Bashwiner v. Bashwiner* (1984), 126 Ill. App. 3d 365, 466 N.E.2d 1161.) In the absence of a transfer, the decretal court has continuing jurisdiction. A court has continuing jurisdiction over the custody of unemancipated children (*Sommer v. Borovic* (1977), 69 Ill. 2d 220, 370 N.E.2d 1078), and the phrase "until further order of the court" is surplusage. An order of custody "until further order of the court" is as permanent as a custody order can ever be. *Cf. In re Marriage of Cesaretti* (1990), 203 Ill. App. 3d 347, 561 N.E.2d 306 (an order granting temporary custody to be reviewed every six months was final and appealable).

In sum, we hold that Rule 306(a) is not applicable here because that rule embraces interlocutory orders of custody. The order in this case was an order changing custody and was a final order. We conclude, therefore, that Andreina's appeal is properly before us under Supreme Court Rule 301 in that the entire judgment was a final judgment. That Andreina filed an interlocutory appeal under Rule 307(a) is of no consequence to us. See *In re Marriage of Hagaman* (1984), 123 Ill. App. 3d 549, 462 N.E.2d 1276.

The second reason for our denial of the motion to dismiss arises from an observation of the supreme court in *Purdy* in which the appellee made the same argument that Robert makes here: The appellant should have filed a motion for leave to appeal pursuant to Supreme Court Rule 306(a)(1)(v). To that argument the supreme court said this:

> "We note that if the appellate court did not regard the order changing custody as final and appealable, the court should have considered the propriety of the order under Rule 306(a)(1)(v) in order to resolve the custody question as quickly and economically as possible." (*Purdy*, 112 Ill. 2d at 4.)

We have considered the propriety of the order under Rule 306(a)(1)(v). We originally denied Robert's motion to dismiss the appeal, and we later took the motion with the case. We have now considered the entire case. We conclude without question that we would have allowed a petition for leave to appeal. When we consider the position taken by Robert in the trial court as to the nature of the relief sought, it is understandable that Andreina's attorney did not file a petition for leave to appeal. Under all the circumstances of this case, we judge that any order dismissing this appeal would be monstrous. The motion to dismiss the appeal of the order of July 22, 1991, is denied.

■ Rule 307(b) provides that a party intending to take an appeal from an *ex parte* order shall first present a motion to the trial court to vacate the order. Robert maintains that no motion to vacate was filed. We disagree. Andreina filed a motion to disqualify the attorneys representing Robert and to declare the order of January 2, 1991, void *ab initio*. The attorney for Robert objected to any order "vacating" the order of January 2, 1991. The judge, in substance, denied the motion. However, Andreina did not file a notice of appeal within 30 days after the denial of the motion, as further required by Rule 307(b). For that reason the appeal of the order of January 2, 1991, is dismissed.

We turn first to the facts. On January 2, 1991, Robert appeared with Charles J. Fleck and David B. Yavitz of the law firm of Schiller, Du Canto & Fleck. When the judge asked if both sides were present,

Fleck told him that the petition had been filed without notice and that they would show why the order should issue without notice.

Robert testified that during his visits with Andrew over the previous four or five months, he noticed marks, bruises and abrasions on Andrew. The bruises were primarily on the arms and legs; Andrew also had a head laceration which required stitches. He noticed that Andrew suffered a split lip sometime in early December 1990 and another one in mid-December.

Andrew is an intelligent child and can speak and understand sentences. When he first asked Andrew about the first split lip, Andrew responded that "mommy hit him." He noticed a second split lip when he picked Andrew up for visitation. At that time when Andrew got into the car and before Robert said anything, Andrew said, "Mommy mad, mommy hit me."

Three months before the hearing, Andrew had problems standing. When asked why, Andrew responded that mommy had pulled his leg. Robert asked Andreina about Andrew's injuries. She said that the leg injury occurred when she accidentally twisted his leg when lifting Andrew up; she said the other injuries occurred when Andrew fell and hit himself.

Robert and Andrew became very close during this period of time. When Robert would return Andrew after their visit, Andrew became very fearful, stating that he is "scared of mommy"; Andrew started crying and became hysterical. When Robert put him in the car on the return trips, Andrew began kicking and screaming, "No" and "Please help me." Once in the car, Andrew would not talk and went into a shell. When the car got close to Andreina's house, Andrew began screaming and pleading with Robert to help him; Andrew has tried to lock himself in the car at times.

On December 2, 1990, he returned Andrew to Andreina as per the visitation schedule; Andrew was screaming that he was scared and did not want to go. Andreina hit Andrew on his bottom two or three times. Andrew began to cry harder and became more hysterical. Andreina then hit Andrew twice in his head with her fist and told him "shut up or be quiet." Robert then took Andrew away from Andreina and went to the Evanston police station.

The police told Robert to contact the Department of Children and Family Services (DCFS) about an investigation. They also told him that they would speak to Andreina and tell her that one more act of violence and they would put her in jail.

He had noticed violent proclivities on Andreina's part in the past. On their honeymoon Andreina smashed a $700 Lladro vase against

the wall when she became upset because Robert wanted to buy his nephew a $20 toy train. He saw Andreina and her mother punching each other in an argument over a bottle of Lemon Joy, a dishwashing liquid.

Andreina wanted to take Andrew to Argentina for three weeks. She refused to give Robert the telephone number or the addresses of the relatives with whom she would be staying. She was raised for a significant portion of her life in Argentina. She said on previous occasions that she thought Argentina was a better country than the United States and that she would prefer to live there.

Robert said he had been denied visitation five or six times over the previous six-month period. He feared that if Andreina had notice of the *ex parte* proceedings, she might take her frustrations out on Andrew. He expressed concern over the proposed trip to Argentina; he feared Andreina might not return with Andrew.

Mark Podolner testified that he was a parenting educator who was appointed by the court to supervise Robert's visitation. He had supervised visitations for about seven years. His role was that of a "pseudo-guardian," to provide information on behalf of the child. He supervised Robert's visits with Andrew from June through September of 1989. Robert had a positive relationship with his son. Podolner had spoken with Andreina on several occasions and had met with her in August of 1989; he believed that she was extremely hostile.

Robert called him in early December 1990. Robert was concerned about Andreina's alleged abuse of Andrew. Podolner visited with Robert and Andrew to observe their relationship. Andrew was afraid of Podolner and clung to his father. When told that he was going back to Andreina's, Andrew became terrified and said, "No mommy, no mommy." In his opinion Andrew had been "traumatized" by Andreina. He had seen similar behavior from children who had been physically or sexually abused, but usually the child feared the noncustodial parent.

He visited with Andrew and Robert again the next week. He played a game in which Andrew pretended to kill him with laser weapons. The game was typical, but Andrew had an unusual degree of intensity for a child of that age. When Andrew was told he was going back to his mother, he exhibited the same type of fearful behavior. In Podolner's opinion it was possible for a child to be "brainwashed" into acting that way, but he did not believe that to be the case based on his knowledge of Robert and his family. He found that Andrew's reactions in this respect were spontaneous.

He accompanied Robert and Andrew to Andreina's home. He observed that Andrew became withdrawn. In his opinion there were several reasons for this behavior, including withdrawal from what Andrew was experiencing. Podolner was concerned that Andreina would either physically take her frustrations out on Andrew or leave the country with Andrew.

The last witness was Dr. Phillip Helding, who was tendered as an expert witness. He was a child psychiatrist affiliated with Loyola Medical Center. He treats abused children several times a week.

Robert had contacted him on December 28 for an emergency evaluation of Andrew. He met with Robert and his sister the following day and received background information. He then met with Robert, his sister, his mother, and Andrew on December 30, 1990, for approximately one hour. He observed that Andrew was cautious, timid and did not interact with him. He noted that Andrew appeared to have a good relationship with Robert and his family.

Andrew was left alone with Helding for a short period of time. Andrew became very upset, which Helding characterized as unusual, but he expected such behavior considering Andrew's inability to become comfortable with him during the earlier period. Andrew would not stay with him and finally had to be forcibly taken from Robert's sister, who initially observed the meeting between the two. When alone with Helding, Andrew just continued to scream and call out for Robert and his sister for several minutes.

Andrew stated that he was afraid that there were bugs in the room and ghosts in the closet. In Helding's opinion this fear of ghosts and bugs evidenced extreme anxiety and Andrew felt a need to attribute this anxiety to objects. When he asked Andrew if he wanted to see his mother, he screamed and began crying again. Andrew said he was scared of his mother and did not want to be with her; he wanted Robert and his sister. Based on his observations of Andrew, Helding was of the opinion that Andrew had been "traumatized" by his mother in some manner.

The judge was informed that Andrew had been with Robert since December 27 and was to be returned to Andreina on January 3. The judge gave an *ex parte* order for protection for 14 days. He found that Andreina had committed physical abuse on Andrew as defined in the Illinois Domestic Violence Act and that if she were given previous notice of the *ex parte* proceedings it was likely that Andrew would suffer continued abuse. The order provided that Robert would have uninterrupted visitation until January 14, 1991. Andreina was also ordered to turn Andrew's passport over to the court.

On January 14, Andreina and her counsel appeared and an agreed order was entered which continued the order of protection with supervised visitation for Andreina. On February 6, 1991, the judge began hearings to determine whether the order of protection should be extended. Testimony was heard on 10 different days over a period of almost six months.

Andreina was called first as an adverse witness and later on her own behalf. At the time she testified she was a part-time student at the University of Chicago. She had graduated from Northwestern University in June 1989 with a bachelor of arts degree. Robert began supervised visits with Andrew in June 1989. She feared that Robert would mistreat Andrew because he denied paternity during her pregnancy. She began to notice a change in Andrew's behavior; she suspected her husband of injecting Andrew with drugs to facilitate a "brainwashing process." On December 13, 1989, she noticed a red mark on Andrew's buttocks and called the Evanston police. She took Andrew to the hospital for tests; the medical report indicated that the red mark was an insect bite.

Generally, Andrew would be dropped off at Andreina's by Robert or his sister. They would ring the buzzer and Andreina would come down and get Andrew. There were never any problems with the exchanges until November of 1990. At that time, Andrew began to return home in an anxious and upset state. She could see him screaming and kicking when Robert brought him back. Andrew would calm down quickly, however, often on the way from the lobby to her apartment.

On December 2, 1991, Robert brought Andrew in kicking and screaming. Andrew was carrying a yellow blanket and clinging to his father. Andrew told her that he didn't like her and that he was going to hit and kick her. Robert placed Andrew on Andreina's lap, and Andrew continued to squirm and screamed for Robert. Andreina got up and took Andrew to the elevator; Robert followed. Andreina did not want to be on the elevator with Robert, so she went to the stairwell to talk to Andrew in private. Robert came into the stairwell and took Andrew from her, pushing her with his elbow. She asked what he was doing, and he responded that he could take Andrew whenever he wanted to. They argued for about five minutes in the stairwell. Robert pushed her away from the door with his elbow, left the stairwell and left the building. She ran after him. Robert put Andrew into his car, and when Andreina got near the car he pushed her away.

Andreina called the Evanston police and told them that Robert had taken Andrew; a policeman came to her home and she filled out a report. A neighbor brought her Andrew's blanket.

Andreina, accompanied by her mother, followed the officer to the police station. At the station she met with several police officers including Officer Jones. Jones told her that Robert had made allegations of abuse against her. She immediately denied the allegations. She waited for approximately two hours in the reception area while the officers discussed the case with Robert and his family.

She noticed a bruise on Andrew once when he returned from a visit with Robert, but did not seek medical attention for the bruise. She denied that Robert had ever called her about bruises on Andrew's arms and legs. Andrew had received the stitches over his eye when he slipped and fell at her parents' home, hitting his head on the oven door. The split lips would occur when Andrew, who has an overbite, fell down. He had also fallen in the bathroom and broken his tooth.

She had taken two videotapes of her son which were received in evidence. The first depicted Andrew's first birthday party on February 8, 1989; the second was taken six months later. She also made two audiotapes of Andrew after he returned from visits with Gordon. She made the audiotapes to make a record because she did not like that Andrew came home with "aggressive toys."

She testified that when she gets upset she raises her voice. She denied ever striking her son in anger. She disciplines Andrew by telling him "No" or "Don't do that." If he persists, she smacks him on the hand or spanks him on the diaper. She denied ever striking him in the head, in particular on December 2, 1990. She denied destroying a Lladro vase.

Steven Jones, an Evanston police juvenile officer, testified that Robert brought Andrew into the police station on December 2, 1990. Robert explained the incident which occurred at his wife's home and of his son's behavior. Jones waited for Andreina to arrive. He spoke with her for approximately 15 minutes and then took everyone upstairs. He attempted to interview Andrew alone and initially got no response. Robert's sister then came into the room and Jones questioned Andrew. In response to Jones' question about whether he loved his mother, Andrew said, "Mom hit me." Jones indicated that Andrew motioned with his hand hitting his head. Jones asked Andrew if wanted to go home with Andreina and Andrew responded by screaming "No" and that he did not want to go home with her. He said that he wanted to go home with his father. Jones examined Andrew "totally" and found no marks or bruises. Andrew was taken home by Andreina with the consent of Robert. Jones said that if he had any evidence of child abuse, he would not have permitted Andrew to go home with Andreina. A report was made to the DCFS pursuant

to standard police procedure. Robert did not want Andrew to be taken to a child shelter.

Eunice Gordon, Robert's mother, testified that her son lived with her and that she was present most of the time when Andrew visited. She also testified to Andrew's behavior when informed that he was returning to his mother's.

On December 2, Robert dropped off Andrew and placed him in Andreina's lap. She heard Andrew screaming and saw him kicking. She had left the car; it was the first time that she had ever done so; she did so because the weather was cold and the car motor was not running. She went to the entryway of the building. She saw Andreina, whose face had turned red, hit Andrew once in the cheek with her fist and then "pat" him on the back a few times. Robert then took Andrew and returned to the car. On cross-examination she denied ever telling anyone that she did not see what occurred. Andreina later attempted to show through Officer Jones that Eunice Gordon had told him that she had not seen what had occurred. The judge sustained Robert's objection to Jones' impeaching testimony. That ruling is assigned as error.

Janice Ginsberg, Robert's sister, testified that she saw a mark or bruise on Andrew on several occasions. Later she said she had seen a bruise on only one occasion during the previous six or seven months. Robert told her that Andreina said Andrew had fallen. During the previous six months she noticed Andrew had a cracked tooth. Andrew told her it happened at his mommy's house. She noticed something "like a gash" on Andrew's ear. She spoke to Robert about it because she was always worried about infections. He told her he did not know how it had occurred. She also noticed stitches over Andrew's eye above the outer left eyebrow. Robert told her that Andreina said it was an accident. About four months earlier Janice noticed Andrew had a cut on his bottom lip. She noticed a second cut appearing on Andrew's upper lip. On direct examination she said she could not recall noticing Andrew with a cut lip on any other occasion. On cross-examination she testified she saw cuts on Andrew's lips four or five times. She never asked Robert about the cuts because she did not think they were unusual. Later she said that she did think that the second cut lip was unusual, but she did not bring it to Robert's attention because "as long as the child was playing and was happy," she did not want to interfere.

She went to the police station on December 2, 1990, at the request of Robert, who had called her. Her testimony of what occurred

at the police station was similar to the testimony of Robert and her mother.

Robert, Podolner and Helding also testified. Their testimony was largely a repetition of their testimony at the *ex parte* hearing with some omissions and additions. The judge took Andreina's motion for judgment at the close of Robert's case under advisement.

Dr. Patricia Mather was the first witness called by Andreina. She was a child psychologist. She listed her educational and professional accomplishments. She was initially contacted by Andrew's maternal grandfather, Dr. Floreani. She examined Andrew on December 21, 1990, for about five minutes to assess the reactions he displayed after a visit with Robert and to give suggestions to Andreina on how to reduce Andrew's stress. She interviewed Andreina, who informed her that Andrew would return upset after visits with his father, exhibiting aggression and wanting to hit and kick Andreina. Andreina told Mather that after one-half hour Andrew would return to normal.

Mather also saw Andrew on February 2, 1991, to determine whether Andreina had abused Andrew. She watched the videotapes which had been admitted into evidence. Based on the December 21, 1990, meeting she had with Andrew it was her opinion that Andrew was suffering from separation anxiety from both parents. Under this disorder a child can exhibit aggression and violence towards the person from whom the child is separated. This condition is more common in developmental periods when a child is under stress. Mather stated that Andrew exhibited no signs of being an abused child. There were no marks on Andrew, and he possessed none of the qualities of an abused child. She could not form an opinion with a reasonable degree of certainty that Andrew was an abused child because there was not enough empirical data present.

On cross-examination she stated that her December 1990 opinion was based on the five minutes she saw Andrew and the information provided by Andreina in the intake interview. The behavior she found most persuasive was that Andrew had difficulty separating from his mother in Mather's office and from Robert during her interview with Robert on February 2, 1991. She had never diagnosed a victim of child abuse before.

Michael Bertrand testified that he had been a child protective investigator for the DCFS for four years. His job was to investigate allegations of child abuse. He received notification of the occurrence of December 2, 1990, from the Evanston police. He went to Andreina's home in December 1990, but no one was home. He met with Andreina early in January 1991; Andreina contacted him after he unsuccessfully

attempted to reach her on several occasions. Andrew was not present at the meeting. Bertrand went to Robert's house in an attempt to see Andrew in early January. He received no answer at the door. He called on a couple of occasions and spoke to a woman who identified herself as Robert's mother; she told him that she had given his previous messages to Robert. Robert did not return Bertrand's calls. He sent a mailgram to Robert stating that the DCFS had received the report and that Bertrand needed to speak with him. He received no response from Robert. Later he said that his final report showed that the abuse was unfounded. The attorney for Robert moved to strike all of Bertrand's testimony as having no probative value. The judge struck the testimony. That ruling is also assigned as error.

Karen Hogan was a pre-school teacher with a degree in elementary education. She testified that in September 1990 Andrew began attending nursery school where she taught. Andrew attended school two or three days a week, but not usually for a full day. Andrew had a difficult time for the first month when he was initially left at the school, but he adjusted after his hesitation in coming into the school lessened. He would cling to his mother and cry when she left and would be excited when his mother picked him up.

Hogan observed Andrew's body from September to December 1990 when changing him at school. She never noticed any unusual marks on him; Andrew might have a bump on his knee or such, but no bruises. She did not notice a laceration near Andrew's eye, split lips, a cracked tooth, or an inability to use his left hand or walk on his right leg.

Maria Floreani, Andreina's mother, testified that during the summer through the end of 1990, she, her husband and Andreina provided the primary care for Andrew. She saw Andrew almost every day. The amount of time and the time of day of these visits varied. She observed him three times a week, and sometimes Andrew did not want to eat. She never witnessed any anger on Andreina's part toward Andrew; she said that Andreina was patient with Andrew. Andreina had a good personality. She denied ever having a dispute with her over a bottle of Lemon Joy detergent.

She changed Andrew's diapers and bathed him. She never saw any significant bruises on Andrew's body. Andrew had bruises which he received as the result of running and playing. He suffered a cut near his eye at her home in January 1990 when he slipped and hit his head on the oven. She never noticed that Andrew had a problem picking up objects with his hand or walking on his right leg in the second half of 1990. Over the last half of 1990, Andrew split his lower lip two

or three times when he fell; she observed Andrew fall at her house and suffer one of those split lips.

On cross-examination she testified that Andrew's behavior following the transfers from Robert to Andreina after Robert's visitations was normal until November or December of 1990. At that time, she noticed that Andrew was unhappy or upset and would say "No, no, no" and "I hate you" to her or Andreina. He would calm down about 25 minutes after being dropped off.

Dr. Evan Floreani, Andreina's father, testified he was a physician specializing in internal medicine and hematology. Andreina was a good and sensitive girl who did well in school. He had the opportunity to observe Andrew three or four times a week for approximately three to four hours each time during the latter part of 1990.

He bathed and examined Andrew; he did not see any bruises or lacerations on him during the latter part of 1990. He heard Andrew fall and hit his head on the oven when Andrew was visiting his house. He noticed that Andrew had a cracked tooth at one point, but never noticed that he had any difficulty walking. He noticed that Andrew had an overbite, and he once noticed a cut on his lower lip.

Dr. Richard Ciskowski, Andrew's pediatrician, testified that he first saw Andrew after his birth and attended to him periodically since then. He saw Andrew on July 3, 1990, and examined him because Andrew was suffering from a virus. He also examined Andrew on December 20, 1990, because Andrew had some congestion. He made an appointment to see Andrew on December 24, 1990, but the appointment was not kept by Andreina. The judge sustained objections by Robert's attorney to questions that were designed specifically to show that Dr. Ciskowski examined Andrew and saw no bruises. No error is assigned to those rulings. We judge nonetheless that Dr. Ciskowski saw no bruises on Andrew or he would have said that he had seen them when he was describing the results of his examination.

Lawrence Abrams testified that he was a friend of Andreina and had known Andrew for two years. He denied being romantically involved with her. He saw Andrew about once a week and baby-sat for him three or four times, changed his diapers and bathed him on various occasions. During the latter half of 1990, Abrams did not change Andrew, but bathed him half a dozen times. On two occasions, he noticed a small trivial bruise on one of Andrew's legs. He never noticed that Andrew had a cracked tooth, inability to grasp objects with his hand or an inability to walk on his right leg. He noticed that Andrew had two or three split lower lips.

On December 9, 1990, he baby-sat for Andrew for seven or eight hours. He observed Andrew's arms and legs and did not see any bruises. When Abrams picked Andrew up on that day to take him to his apartment, Andrew looked as if he had recently stopped crying, but he was fine a short time later. When Abrams dropped him off at Andreina's at the end of the day, Andrew did not appear upset in any way.

Abrams was waiting in the lobby of Andreina's building when Robert returned Andrew on December 9 and 16 because Abrams was concerned after hearing about the events of December 2. Abrams was not present at the exchange on December 9. On December 16, Abrams saw Robert drop Andrew off at Andreina's. The exchange took place without incident as Andrew did not protest being turned over to Andreina. Abrams spent most of the day with Andreina and Andrew at the Museum of Science and Industry; Andrew and Andreina interacted without any problems.

Dean Graham of the Family Institute of Chicago was called to testify. She had been assigned the supervision of visitation of Andrew by order of the court appointing the Family Institute of Chicago for that purpose. The judge allowed Robert's motion *in limine* barring her testimony because her knowledge of the case came after the *ex parte* order had been entered. Andreina's counsel made an offer of proof that Graham would testify that since she had been appointed she had supervised visitation between Andrew and his mother once or twice a week and that during those visits Andrew and his mother interacted well and that Andrew knew that Andreina was his mother. Andrew demonstrated a loving, open, affectionate relationship with his mother. That *in limine* ruling is also assigned as error.

Barbara Wilson testified that she lived in the same building as Andreina and had known her for almost eight years as an acquaintance, but she had only spoken to her four or five times over that period. She was at home at 11 a.m. on December 2, 1990, when she heard a loud argument involving a female. She said the argument lasted about five to seven minutes. She went downstairs by way of the stairwell where she saw a baby's yellow blanket on the landing; she picked up the blanket and put it on a couch in the lobby. (The blanket was later returned to Andreina.)

She also testified that when the door between the stairwell and the lobby is closed, there is no way for anyone in the lobby to look out into the stairwell. Anyone standing outside the building could not see what was occurring inside the stairwell.

Mitchell Klass, the engineer of Andreina's building, testified that he had observed Andreina and Andrew on a daily basis for 16 months including the last half of 1990. Andrew was a happy boy, and when he grew upset, Andreina would comfort him. Klass never saw any bruises on Andrew at any time. Klass said, "[Andrew] was a happy boy, very happy little boy. There were times like any other little boy, you know, he'd get upset and want his way." He was asked how Andreina would act when Andrew would become upset, and he said, "She was very soft-spoken. And she would always comfort him in a way." He said that the relationship between Andrew and Andreina was "very close. He would always, always hang on to her."

At this juncture, it is appropriate to discuss a trip to Argentina that Andreina intended to take with Andrew, her mother and father and Andrew's "aunt and uncle," who were not further identified.

On November 14, 1990, Andreina, through her attorney, notified Robert that she wished to take Andrew on vacation with her to Argentina from January 4, 1991, through January 27, 1991.[2] The purpose of the vacation was to permit Andrew to visit his 85-year-old great-grandmother for the first time. Andreina had already purchased the airline tickets. She asked that Robert communicate any dissatisfaction to her proposal "immediately." On December 2, 1990, by certified mail, Andreina once again informed Robert of her desire to take Andrew on vacation from January 4 through January 27, 1991. Again Robert was asked to communicate any dissatisfaction with the removal of Andrew for the three-week period "immediately." The December 2 letter from Andreina to Robert referred to a letter from Robert to her requesting a one-week winter vacation with Andrew. She informed him that Andrew would be available to him from Thursday, December 27, 1990, at 10 a.m. until 10 a.m. Thursday, January 3, "exactly as [Robert] requested."

Robert prepared a letter on December 10, which was served by certified mail on Andreina on December 13. In that letter Robert reminded her that both he and she were entitled to one week's vacation with Andrew pursuant to the agreed order. He said that he expected to exercise his visitation with Andrew starting Saturday, January 12, 1991, at 10 a.m., until Sunday, January 13, 1991, at 10 a.m. In effect, he was telling her he would not consent to her taking Andrew to Argentina for three weeks.

---

[2]In his petition filed January 2, 1991, Robert said that he had learned "recently" that Andreina planned a trip to Argentina. He testified at the *ex parte* hearing that he had learned of the trip three weeks before. It was seven weeks before.

On January 3, 1991, Andreina's attorney filed an emergency petition to remove Andrew for three weeks to permit the trip to Argentina. The notice of the petition informed the lawyer, James T. Friedman, who had represented Robert, that Andreina's attorney would appear on January 4 for an emergency hearing on her petition. Neither Andreina nor her attorney knew at that time that Robert had obtained the order of January 2, 1991, which was served on Andreina on January 3.

When called by her attorney, Andreina testified that Robert had visitation the Wednesday following December 2, 1991. He also had overnight visitation the following Saturday. On neither occasion did Robert make any objection to her custody. On December 13, 1990, she received a telephone call from Robert. He wanted to know if she would go on a trip with him to Florida without his mother being present and if she would take Andrew to Disney World instead of to Argentina. He said that he had no objection to her trip but to the duration. He would not mind her going for one week, but he would mind her going for three weeks. She did not accept that because she did not want to be alone with Robert far away. She did not "like the idea at all."

Robert picked up Andrew on December 27 and was to return him one week later on January 3. During that week she called Robert's home three times but was never able to speak to Andrew. She was told that he was either sleeping or that he was not there.

She received another invitation from Robert to spend New Year's Eve with him and Andrew. He called with that request at the end of December. She told him, "I don't think that's appropriate, after all the things that we've been through." He again said that he objected to her taking Andrew out of town for three weeks. Her testimony of those conversations with Robert was unrebutted.

She identified an album of pictures taken of Andrew between June and the end of December 1990. She testified that they fairly and accurately portrayed Andrew. The judge sustained an objection to the introduction of the pictures. That ruling is also assigned as error.

Three videotapes and an audiotape were received in evidence. One videotape was taken by Robert on December 8 and 9, 1990, at the direction of his attorney Charles J. Fleck. That videotape shows Robert picking up Andrew on December 8, Andrew at Robert's home before he returned to his mother and Andrew riding in Robert's car and being removed from the car on December 9.

Two videotapes were taken by Andreina. One was taken on Andrew's first birthday and the other was taken six months later. The

tape taken six months later shows Andrew in his own home. He is seen clothed walking around the house and climbing and standing on a coffee table; he is seen unclothed standing in a bathtub. Andreina is speaking to him in Spanish. The audiotape, identified as having been taken on December 5 and 13, 1990, after visitations with Robert, discloses Andreina talking to Andrew in English. We have examined the videotapes of December 8 and 9 and of Andrew at 18 months of age; and we have listened to the audiotape. We have also examined other exhibits including a Lladro statue and the Executive Stress Eliminator from Radio Shack which Robert purchased for Andrew and which Andreina thought was too aggressive for a boy of Andrew's age. The Executive Stress Eliminator contains buttons which when pushed produce sounds of bombs falling and exploding and various weapons being fired.

Andreina first argues that the *ex parte* order denied her constitutional due process. We agree that the judge should not have proceeded to an *ex parte* hearing on the basis of what was before him; we agree that he should not have entered his findings of abuse *ex parte*; we agree that the *ex parte* findings led the judge to impose an improper burden of proof on Andreina ultimately; but we do not agree that the order of July 22, 1991, should be reversed *solely* on the ground that the *ex parte* hearing and order represented abuses of judicial discretion.

Robert cites *Sanders v. Shephard* (1989), 185 Ill. App. 3d 719, 541 N.E.2d 1150, in support of his argument that the *ex parte* proceedings and order were proper. In that case Shephard was about to be paroled from imprisonment after a conviction of criminal abduction of his daughter. Sanders, the mother, filed a petition for an *ex parte* order of protection under the Domestic Violence Act. In the attached affidavit, Sanders swore that Shephard had phoned her from prison and threatened to kill her or commit bodily harm against her and their daughter upon his release from prison. She further stated that she believed that Shephard would make arrangements to *further* conceal her daughter and destroy evidence of her whereabouts if he received prior notice. The trial judge entered an emergency *ex parte* order of protection and subsequently entered a plenary order requiring Shephard to produce the child in court. Shephard was subsequently held in contempt on three separate occasions for refusal to return his daughter to the custody of Sanders. The appellate court affirmed the convictions of contempt and rejected Shephard's claim of a denial of due process:

"There is no procedural due process defect in obtaining an emergency order of protection without notice to a respondent, when the petition for the emergency protection order is supported by affidavits that demonstrate exigent circumstances justifying entry of an emergency order without prior notice. [Citation.]" 185 Ill. App. 3d at 727.

■ The facts of *Sanders* bear no resemblance to the facts of this case. In this case, the parties had been before the judge on a number of occasions. On January 8, 1991, the judge said that he was very familiar with the whole background. He pointed out that he had had the case for a year, longer than present counsel had been involved in it. Therefore, the judge was aware of the animosity between the parties, and he was aware that Robert had already attempted unsuccessfully to obtain custody of Andrew on more than one occasion. He was also aware that Robert at one time had surrendered any parental rights to Andrew and had insisted that he had no duty to provide child support for Andrew. Most of all he was aware that Andrew was in the custody of Robert at the time he appeared on January 2. There was no concealment of Andrew by Andreina. There was no reason why the visitation rights of Robert could not have been extended and the hearing conducted with notice to Andreina. She could not abscond to Argentina with Andrew; she did not have him. The judge could have ordered her to surrender Andrew's passport *before* the hearing. We make this last observation in response to the far-fetched argument made in the trial court, which Robert understandably does not make here, that Andreina might go to Argentina and take Andrew with her. Dr. Evan Floreani was a respected physician; he was an American citizen; and he and his wife were permanent residents of the United States. Andreina was a student at the time attending the University of Chicago. Under all the circumstances, any argument that an *ex parte* proceeding was justified because she might flee to Argentina with her son is absurd.

When the judge asked if both parties were present, Robert's attorney simply told him that they would produce evidence to explain why notice should be excused. He did not refer to the affidavit of Robert, which factually was insufficient to justify proceeding *ex parte*; it contained only the conclusional allegation that the "harm that the remedy sought was intended to prevent would be likely to occur." Both Robert and Mark Podolner expressed opinions at the *ex parte* hearing which Robert makes no attempt to justify in his argument on this point. We will discuss the opinions of Podolner again later. Suffice

it to say at this juncture that the opinions given by Podolner at the *ex parte* hearing were improper and extremely prejudicial.

No one can deny that the order entered without notice, which in effect removed the child from the care of his natural mother, was a harsh and drastic one. We judge that neither the affidavit of Robert nor the proof demonstrated exigent circumstances justifying entry of such a harsh and drastic order without prior notice. However, since no appeal was taken from the order and a complete hearing was held, Andreina's claim of a denial of due process is correct as an academic matter, but does not justify a reversal of the July 22, 1991, order. For reasons we will explain later, we do believe that the evidence heard at the *ex parte* hearing and the judge's findings after the *ex parte* hearing were improperly considered by the judge before making the finding on July 22, 1991, and caused the judge to impose upon Andreina an improper burden of proof.

■ Andreina next contends that she was prejudiced by the fact that the lawyers representing Robert at the *ex parte* hearing were the same lawyers she had previously consulted and that the judge erred when he denied her a *de novo* hearing after being advised of a conflict of interest on the part of the lawyers.

Robert was represented at the *ex parte* hearing by Charles J. Fleck and David B. Yavitz of the law firm of Schiller, Du Canto and Fleck (the firm). Another attorney, James Friedman, had represented Robert during the dissolution proceedings. Six days after the order of January 2, 1991, Andreina filed a motion to disqualify the firm. She alleged that she had previously consulted with Donald Schiller and David Yavitz of the firm concerning the custody and visitation issues. She alleged that she had paid fees "for the consultations." She asked that the *ex parte* order of protection of January 2, 1991, be declared void *ab initio* and that a *de novo* hearing be held on the petition for the order of protection.

The firm of Kirsch, Berman and Hoffenberg filed an appearance on behalf of Robert pending resolution of the issue of disqualification. Charles Fleck told the court that the firm was on the "horns of a dilemma" because Robert felt that he would be prejudiced if the firm withdrew. The firm filed a memorandum opposing the motion to disqualify. It alleged that Andreina had met with David Yavitz in June 1988 but had not retained the firm and that Yavitz had no recollection of the meeting or of Andreina. It alleged that on October 6, 1989, Andreina met with Donald Schiller but that the firm did not agree to represent her and that no retainer was ever paid. Schiller had no recollection of the meeting or of her.

The memorandum further alleged that in early December 1990 Robert contacted Charles Fleck and David Hopkins of the firm. He wished to discuss representation by the firm "in post-decree proceedings for a *change of custody* and an order for protection." (Emphasis added.) The memorandum also alleged that Yavitz and Schiller would be excluded from any further participation in the case.

Andreina filed a response to which she attached photocopies of checks, one for $175 dated June 15, 1988, and payable to the firm and another for $300 dated November 25, 1989, payable to Donald Schiller. Also attached was an affidavit by Andreina in which she said that she had conferred with David Yavitz on June 15, 1988, and with Donald Schiller on October 6, 1989; that she had related the entire history of the case to them; and that she had discussed custody and visitation rights and the then pending counterpetition for custody that had been filed by Robert.

On March 25, 1991, the judge entered an order disqualifying the firm. Kirsch, Berman and Hoffenberg continued to represent Robert throughout the hearing. The judge had previously denied Andreina's motion for a *de novo* hearing.

No case is cited by Andreina in support of her argument that the entire proceedings are to be vitiated because of a conflict of interest of an attorney who participated in only part of the proceedings. We would agree with Andreina if only the appeal of the *ex parte* order were before us. For the same reason, however, that we refuse to accept Andreina's argument that the improper *ex parte* hearing and order rendered the order of July 22, 1991, reversible, we hold that any possible conflict of interest on the part of the firm does not render the order reversible.

Andreina next argues that the July 22, 1991, order fails to conform to the statutory requirements of the Domestic Violence Act; she also maintains, in questioning Robert's motives and thereby his credibility, that Robert's petition for a protective order was designed to circumvent the requirements of the Marriage Act and that the petition was an "abuse of process [which] should not be countenanced by our courts." We will consider both these arguments together.

■ Our discussion necessarily begins with an explanation of the provisions of the Domestic Violence Act (Ill. Rev. Stat. 1989, ch. 40, par. 2311—1 *et seq.*). It provides for the entry of (1) an emergency order of protection (Ill. Rev. Stat. 1989, ch. 40, par. 2312—17); (2) a 30-day interim order of protection (Ill. Rev. Stat. 1989, ch. 40, par. 2312—18); and (3) a plenary order of protection (Ill. Rev. Stat. 1989, ch. 40, par. 2312—19). Section 220 provides that emergency orders of

protection shall be effective for not less than 14 days nor more than 21 days; interim orders shall be effective for up to 30 days, and plenary orders, with some exceptions not applicable here, "shall be valid for a fixed period of time, not to exceed two years." Ill. Rev. Stat. 1989, ch. 40, par. 2312—20(b).

Our first task is to identify the nature of the order entered on July 22, 1991. During oral argument, Robert's attorney told us it was a plenary order. We disagree. The July 22, 1991, order was entered on a preprinted form captioned "Interim/Plenary Order of Protection." When the attorneys for both parties appeared on July 22, 1991, for a hearing on the order, a question was raised about the duration of the order. The judge said, "It's not a plenary order subject to further order of court, so this order of protection is going to have to reflect that finding." When the attorneys returned later, the following occurred:

> "MR. HARTE: There is some confusion as to the order that was presented, appears to be that was in the nature of a plenary order. It has to be changed in that regard.
>
> JUDGE: I already indicated—
>
> MR. GOLDBERG: Your Honor will recall that Mr. Berman's proposed order was a form order of protection and also a draft order that incorporated some findings.
>
> JUDGE: Well, findings are on the record. Now all we are waiting for is to *extend that order of protection until further order of court.*
>
>                 * * *
>
> JUDGE: The findings are on the record. *I extended the order of protection* based on the findings." (Emphasis added.)

■ It is clear that the order entered was not a plenary order because the judge and counsel recognized the time limitations for plenary orders. Of course, there is a time limitation for interim orders and emergency orders as well. There is no provision in the Domestic Violence Act for an order of indefinite duration. In our judgment, when the judge extended the order he was extending the emergency order of January 2, 1991. The statute makes explicit that custody is not a remedy that may be granted under an emergency order. Since, as we hold and Robert's appellate attorneys agree, this is a custody order, it necessarily follows that the order was one the judge had no power to enter. Because of the indefiniteness of time expressed in the order and the improper remedy granted, the order was invalid on its face.

The Domestic Violence Act (Ill. Rev. Stat. 1989, ch. 40, par. 2312—14(b)(5)) provides that temporary legal custody may be awarded pursuant to the requirements of Part VI of the Marriage Act. (Ill. Rev. Stat. 1989, ch. 40, par. 601 *et seq.*) Section 610 of the Marriage Act provides as follows:

"(a) Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.

(b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, \*\*\* and that the modification is necessary to serve the best interest of the child." Ill. Rev. Stat. 1989, ch. 40, par. 610.

Robert argues that his petition was filed after the expiration of the two-year period because he filed this action on January 2, 1991, and the custody order was entered in the dissolution of marriage judgment on December 28, 1988. We disagree. The two-year period began to run on March 15, 1990, when the judge denied Robert's motion to vacate that portion of the dissolution of marriage judgment granting custody to Andreina. Our holding in this regard has no effect on our ultimate conclusion since it was and is Robert's position that Andrew's environment would have endangered seriously his physical health.

Thus, no insuperable procedural obstacle was in Robert's path if he sought temporary legal custody under the Domestic Violence Act. His original petition asked for temporary legal custody. The snag was in the quantum of proof. He would have been required to prove the allegations of his petition and his right to the relief he received by clear and convincing evidence. Clear and convincing evidence requires a high level of certainty and is considered to be more than a preponderance while not quite approaching proof beyond a reasonable doubt. (*In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 450 N.E.2d 1385.) By calling the relief "care and possession," he argued successfully that he was required only to prove the allegations of his petition by a preponderance of the evidence. Ill. Rev. Stat. 1989, ch. 40, par. 2312—5.

■ Robert has not advanced any reason, nor can we find one, to justify his proceeding under the Domestic Violence Act rather than the Marriage Act. Whatever the relief he sought—extended visitation, injunction or custody—he could have received it under section 610 of the Marriage Act. To approve the procedure followed in this case would be an open invitation to parties disappointed in a custody dispute to file a separate action under the Domestic Violence Act and call it something other than a claim for custody. We recognize that proceedings may be maintained under both the Marriage Act and the Domestic Violence Act. (*In re Marriage of Fischer* (1992), 228 Ill. App. 3d 482, 592 N.E.2d 604; *In re Marriage of Blitstein* (1991), 212 Ill. App. 3d 124, 569 N.E.2d 1357.) In this case, however, the Domestic Violence Act was misused and was a subterfuge to circumvent the requirements of the Marriage Act. Cf. *In re Marriage of Los* (1992), 229 Ill. App. 3d 357, 365, 593 N.E.2d 126, 131 (appellate court criticized the use of a petition for an emergency protective order involving custody rather than a petition for modification of judgment; court did "not appreciate the way in which the judicial system was manipulated" because, as here, there were no exigent circumstances justifying proceeding *ex parte*).

We would be justified in reversing the judgment on the grounds that the judge exceeded his statutory authority and that the Domestic Violence Act was misused, but if we reverse the case on those grounds only, still unresolved would be Robert's petition for a change of custody. It is reasonable to anticipate that he would seek a hearing on that petition and to introduce the same evidence that he had presented on his petition for a protective order. For the sake of finality and to resolve all "custody question[s] as quickly and economically as possible" (*Purdy*, 112 Ill. 2d at 4), we will consider all but one of the other arguments raised by Andreina, including Andreina's claim that the judge's findings were against the manifest weight of the evidence.

We recognize that any petition for a change of custody must be supported by clear and convincing evidence, but a determination that a party has failed to prove a case by a preponderance of the evidence is, *a fortiori*, a determination that a claim was not proved by clear and convincing evidence. We have determined that Robert has not proved his right to a change of custody by a preponderance of the evidence.

At this point, it is necessary to identify the judge's findings. Before the judge made those findings Robert's attorney argued that "it was the testimony that you heard *both* at the temporary hearing, the *ex parte* hearing, and this hearing that you base your decision on."

(Emphasis added.) He also said, "We have, in effect, shifted the responsibility in this case to Andreina, in order to show that, in fact, the abuse did not occur by virtue of the evidence that has been presented to the court." Most significantly, Robert's attorney conceded that there was no "direct evidence of abuse in this case."

The judge apparently accepted the argument that the burden shifted to Andreina, as evidenced by the following remarks:

> "Let the record show this matter coming on to be heard on extension or termination of *ex parte* order of protection entered on January 2, 1991, the witnesses and the weight and quality of the evidence, including three replicas of the Lladro statue, having viewed the videotapes submitted by Dr. Gordon and Andreina Gordon Floreani, particularly observing Andrew on the coffee table, the court finds unrefuted testimony that indicates that Andrew has had cracked teeth, lacerations on the ear, a gash over the eye and split [lips] four or five times. And Dr. Gordon made inquiry concerning the injuries and Andreina replied they were accidental and none of his business. She even failed to keep the December 24, 1990 appointment with Andrew's pediatrician Dr. [Ciskowski]. The parent has an absolute responsibility to keep a child of Andrew's age from harm's way. That responsibility has been lacking in this case. This is not a case of normal bumps and bruises, even only one hitting on the head constitutes physical abuse and causes fear of that parent. It is therefore ordered that Andreina has failed to negate Dr. Gordon's *prima facie* case and a motion for directed verdict is denied; that the order of protection entered on January 2, 1991, is extended until further order of court; that supervised visitation of Andrew by Andreina shall continue as ordered."

■ The remarks of Robert's attorney and the judge disclose several errors. First, it was improper for the judge to consider the evidence heard at the *ex parte* hearing. Although we have not found an Illinois case dealing specifically with this point, cases from other jurisdictions are persuasive. In *Huskins v. Yancey Hospital, Inc.* (1953), 238 N.C. 357, 78 S.E.2d 116, the supreme court of North Carolina held that the findings of fact and other proceedings of a judge who hears an *ex parte* application for an interlocutory injunction are not proper matters for the consideration of the court in passing on issues determinable at the final hearing. A similar expression was made in *State v. Neil* (1966), 4 Ariz. App. 258, 419 P.2d 388, *vacated on other grounds* (1967), 102 Ariz. 110, 425 P.2d 842, in which the appellate

court of Arizona quoted with approval from the court of appeals of New York in *Walker Memorial Baptist Church, Inc. v. Saunders* (1961), 285 N.Y. 462, 474, 35 N.E.2d 42, 47:

> "The granting or refusal of a temporary injunction does not constitute the law of the case or an adjudication on the merits, and the issues must be tried to the same extent as though no temporary injunction had been applied for."

See also 42 Am. Jur. 2d *Injunctions* §287, at 1084 (1969); compare *Smith v. Smith* (1977), 246 Pa. Super. 607, 371 A.2d 998 (no error in proceeding *ex parte* where parties agreed that the evidence adduced at the *ex parte* hearing would not be used in further proceedings).

We anticipate and reject the argument that Andreina waived any objection to the judge's considering the evidence heard at the *ex parte* hearing. She had already moved for a *de novo* hearing, even though on the ground of an alleged conflict of interest, and she repeatedly pointed out that she had not had an opportunity to defend herself before the entry of the *ex parte* order. When the judge denied the motion to vacate the *ex parte* hearing and for a *de novo* hearing, she had every right to believe that the judge had decided to consider the *ex parte* proceedings and that any further objection would be futile.

■ The judge erred when he accepted Robert's attorney's argument that the burden of proof shifted to Andreina to show that "the abuse did not occur by virtue of the evidence that [had] been presented to the court." Accepting that statement, the judge said that Andreina had failed to negate Robert's *"prima facie* case and the motion for directed verdict is denied." We do not understand this remark. The time for ruling on Andreina's motion for a finding at the close of Robert's case, which the judge had taken under advisement, had long since passed. All of the proofs were closed. The issue was whether Robert had proved abuse by a preponderance of the evidence, as required by the Domestic Violence Act, not whether he had made out a *prima facie* case.

We also do not understand precisely what the judge's findings were. They do not meet the requirements of section 214(c) of the Domestic Violence Act (Ill. Rev. Stat. 1989, ch. 40, par. 2312—14(c)) or of section 610(b) of the Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 610(b)). We suspect, but are not sure, that he found Andreina guilty of neglect rather than willful mistreatment insofar as the cracked tooth, the laceration of the ear, a gash over the eye and split lips were concerned. We also suspect, but are not sure, that he found that she had struck Andrew on the head once.

■■ We are most puzzled, however, by the judge's pronouncement of law that a "parent has an absolute responsibility to keep a child of Andrew's age from harm's way." Imposition of such an "absolute responsibility" on a parent is tantamount to making a parent an insurer of a child's safety; the sanction to be imposed on a defaulting insurer parent, regardless of the diligence of the parent, may be loss of custody of the child. That is not, and obviously cannot be, the law.

We also disagree with the judge's implied imposition of guilt based on the fact that Andreina failed to keep an appointment with Dr. Ciskowski on Christmas Eve or that she let Andrew stand on a coffee table. These are hardly grounds to take a child from its mother. The same can be said for the finding that Andreina told Robert that Andrew's injuries were accidental and were none of Robert's business.

An explanation of the judge's reference to three Lladros is in order. Robert testified that Andreina smashed a Lladro on their honeymoon in a fit of temper. Andreina denied that allegation and introduced into evidence a Lladro which, she said, was the only one she ever owned and was unique. She referred to a specific number on the base of the statue. In oral argument, Robert's attorney produced three Lladros identical to the one that Andreina had introduced and bearing the same number. The judge apparently considered the three Lladros in assessing Andreina's credibility.

■■ Before discussing Andreina's claim that the order was against the manifest weight of the evidence, we will pass on Andreina's claim that evidence was improperly excluded. We do so because we have concluded that we may consider improperly excluded evidence in determining the manifest weight of the evidence. (See *Phillips v. Salk, Ward & Salk, Inc.* (1974), 20 Ill. App. 3d 359, 314 N.E.2d 262; *Littlestone Co. v. County of Cook* (1974), 19 Ill. App. 3d 222, 311 N.E.2d 268; compare *Goldblatt Brothers, Inc. v. Addison Green Meadows, Inc.* (1972), 8 Ill. App. 3d 490, 290 N.E.2d 715 (improper for reviewing court to consider excluded evidence where no meaningful opportunity had been given to cross-examine an expert witness whose testimony was improperly excluded).) In this case Robert had every opportunity to cross-examine the witnesses whose testimony was excluded except Graham. He did not question Graham's credibility. His objection was that her testimony was irrelevant.

Eunice Gordon testified that she saw Andreina strike Andrew once in the cheek with her fist. Andreina called Officer Jones and attempted to show that Eunice Gordon had told him that she had not seen anything. The judge sustained an objection to this testimony.

That ruling was error. Robert's claim now that Andreina's offer of proof was insufficient is without merit. (See *Coleman v. Central Illinois Public Service Co.* (1990), 207 Ill. App. 3d 96, 565 N.E.2d 274.) So is the claim made now that Andreina failed to provide a proper foundation.

DCFS investigator Bertrand testified that, despite his repeated efforts by telephone and telegram to contact Robert, he never received any response. Andreina did meet with Bertrand. Bertrand made a report that the claim of child abuse was unfounded. The judge allowed Robert's motion to strike all of Bertrand's testimony. Bertrand's testimony that he found the claim of child abuse unfounded was properly stricken, but the testimony that Robert failed to respond to Bertrand's requests was improperly stricken. That Robert refused to cooperate in any investigation of child abuse (which Robert himself instigated) is probative on the issue of his credibility. Robert thought such conduct was probative when he alleged the following in his affidavit in support of his petition for a protective order:

> "A police report was in fact filed and the Department of Children and Family Services became involved. To the best of my knowledge, no report has been forthcoming from the Department of Children and Family Services because they have not been able to contact, meet with and/or speak with my former wife."

We now know that DCFS had been able to speak with Andreina, but not with Robert.

Dean Graham had been assigned to the court-ordered supervision of Andreina's visits with Andrew in 1991. Andreina offered to prove that Graham would testify as follows: Since her appointment she had had an opportunity to supervise visitation once or twice a week, perhaps more times, since the time of the appointment until a week before her testimony; she observed Andrew and his mother interact; Andrew played well with his mother and identified with his mother as his mother and related in a happy and open manner to his mother; Graham observed nothing that would indicate that Andrew at any time had any fear of his mother; and Andrew demonstrated a loving, open, affectionate relationship with his mother. Last, she would testify that Andrew demonstrated that he had a concept of a bad mommy and a good mommy.

The judge sustained Robert's objection to Graham's testimony on the ground that what she observed occurred after the protection order of January 2, 1991, had been entered. That ruling was also error for two reasons. First, the evidence was probative on the question of

whether Andrew's alleged fear of his mother was real and permanent or had been induced by someone else and was temporary. Second, it was probative on the question of what remedy the judge would fashion, even *if* he were to find that Andreina had struck Andrew. Remedies available under the Domestic Violence Act include injunction and counseling.

Andreina sought to introduce an album of pictures taken of Andrew between June and December 1990. Many of the photographs showed Andrew's arms and legs where the "bruises [were] purported to be." (The pictures allegedly did not show bruises.) Robert's attorney then said that he wanted each picture identified separately. After some colloquy involving a "statue," apparently the Lladro, Robert's attorney said, "I'm going to object to that," and the judge said, "Sustained." When questioned by Andreina's attorney, the judge said, "We had enough testimony insofar as bruises and marks and ear slashes and everything else." We judge that the refusal to permit the photographs on the basis of the objections made and the reason ascribed by the judge was an abuse of discretion.

■■ We turn now to Andreina's contention that the judge erred in permitting the opinion evidence of Mark Podolner. Initially we will respond to Robert's attorney's argument now that Podolner was not an expert witness. Once again, that is not the position that Robert took in the trial court. Robert's attorney said that Podolner was both an expert witness and an occurrence witness. We note also that Podolner believed he was qualified to express a psychological opinion. In any event, whether he was proffered as an occurrence witness or an expert witness, he was permitted to give opinions that he was not qualified to give.

Podolner testified at the *ex parte* hearing that he was appointed by the court in June 1989 to supervise the visitation between Robert and Andrew. The supervised visitation continued from June through September 1989. He expressed the view from "early on" that the case was not an appropriate one for supervised visitation. He last saw Andrew and Robert around September 1989. He spoke to Andreina on several occasions for extended periods. He went out to her home "at [his] own initiative." He was not required or asked to do so by anyone. He was trying to understand the nature of her anger and discontent about the visitation situation. He spoke to her in August 1989 for approximately two hours. She did most of the talking. It was basically a two-hour diatribe against Robert: Robert was a terrible person who had abandoned her in the "context of their marriage relationship," and a "whole series of things," which Podolner described as

having nothing to do with Robert's parenting capacity. When asked his opinion of the personality of Andreina, he said, "She seemed extremely hostile. She also seemed to not understand the best interests of her child. And she would be willing to do anything possible to disconnect the child from the father, absolutely anything."

He also testified as follows:

"A. Basically, I am seen as someone that is there to provide information on behalf of the child.

Q. So, you are sort of a pseudo-guardian-type of situation. You are not for either parent or the State, you are more there representing the child?

A. That's correct.

Q. In an official capacity.

A. Yes.

Q. Do you have an opinion with respect to the parenting skills of Robert Gordon?

A. Yes, I do.

Q. What are those, what is that opinion?

A. I believe that he is an outstanding father. It was clear to myself and others who supervised the visits under my supervision, that he was on the upper end of what we would say is a father in terms of his capacity to engage his child; relate effectively and have that child, you know, have a close relationship with the child."

Robert contacted him in the week of December 2, 1990. They had a number of phone conversations. He met with Robert and Andrew on December 8, a Saturday. He was in Robert's home when Robert said that he was going to take Andrew home. When Robert told Andrew that, Andrew "appeared to be absolutely terrified." Podolner felt that there was no explanation for Andrew's behavior other than the fact that Andrew must be, in fact, "traumatized" by his mother. He had seen such behavior under circumstances "where there is clear evidence, evidence of pervasive and physical or sexual abuse of the child."

He saw Andrew on December 16 at Robert's home. Andrew again reacted by saying, "No, no" when told that he was to go back to his mother. The following significant testimony was brought out:

"Q. Now, from your observation of Andrew on those two occasions, do you have an opinion whether that child could have been brainwashed into reacting in that fashion?

A. Yes, I do.

Q. What is that, sir?

"A. I don't think there is any way that Dr. Gordon or his family members could have influenced this child to behave in that fashion.

Q. What is that based upon?

A. Based upon some knowledge of the family members and their general attitude towards people and towards life. It is based upon the intensity of this child's reaction as truly spontaneous reaction and it is based on the limited time that the family has access to this child."

He went in the car with Andrew and Robert as Andrew was being taken back to his mother. Andrew became totally withdrawn. He concluded that Andrew, by his withdrawal, was trying to protect himself from anxiety that he was experiencing. When he arrived at Andreina's home Andrew did not change. "He was totally withdrawn. He was like a lump of clay when Dr. Gordon removed him from the car." Podolner stayed in the car but saw the actual transfer of Andrew from Robert to Andreina from some distance. He was looking through two sets of glass doors. Robert passed Andrew over to Andreina and "she received the child *without any kind of nurturing or warm response*." (Emphasis added.) He then testified as follows:

"Q. Do you have an opinion as to what she would do if she was given notice of these proceedings this morning?

A. Yes, I do.

Q. What is that opinion, sir?

A. I was very concerned about that possibility. And I think that one of two things are likely to have occurred. One, she would be very violent and could become violent towards the child if he expressed positive feelings toward the father and secondly, she might be inclined to leave the country altogether."

At the subsequent hearing Podolner was permitted to give the following opinions: Robert is a more adequate parent; and Andrew's behavior was comparable to other children he had seen who were afraid of a parent because they had experienced physical or sexual abuse.

We need not discuss the admissibility of Podolner's testimony at length because we are reversing the judgment. It is enough to say that several of Podolner's opinions were inadmissible and were extremely prejudicial to Andreina. His opinions were also very helpful to Robert, particularly his opinion that Andrew was not brainwashed, which was based, in substantial part, on Podolner's knowledge of "the family members and their general attitude towards people and towards life." At the subsequent hearing he was not asked that ques-

tion about brainwashing by Robert's attorney; nor was he asked about Andreina becoming violent towards Andrew if Andrew expressed positive feelings toward Robert; nor about her lack of "nurturing or warm response" when she received Andrew, which Podolner was allegedly able to discern while sitting in a car and looking through two sets of glass doors. The fact that he was not asked those questions is understandable. The testimony was already in evidence, and Andreina had a lawyer present to object.

It is appropriate that we discuss the credibility of Podolner on the question of the sufficiency of the evidence, although Robert does not now attach significance to Podolner's testimony when discussing the manifest weight of the evidence. He says simply that Podolner's testimony was admissible, and if it was not, its inclusion was harmless error.

At the time he testified, Podolner worked for an agency other than Hephzibath. He also had a private practice of his own. Robert paid him $50 an hour for his services and testimony. He was contacted in December 1990 by Robert, to whom he had not spoken since September 1989. He spoke later with Robert's lawyers. His testimony that he went with Robert on December 16 to drop off Andrew is at odds with the testimony of Eunice Gordon, who testified that only she, Robert, her late husband, and Janice on a couple of occasions, ever went in the car to drop off Andrew. It is noteworthy that on December 16, Andrew did not manifest any objection to being returned to his mother.

We will not repeat Podolner's *ex parte* opinion testimony so damaging to Andreina. However, it was brought out on cross-examination at the second hearing that he had written a letter in November 1989, in which he said that Andreina was "deeply committed to Andrew and that she would do what she felt was in [Andrew's] best interest." He also said in the letter that she had a "warm and nurturing relationship," a "very loving and tender" relationship, with Andrew. Needless to say, that picture he painted of Andreina in November 1989 was in sharp contrast with the picture he painted of her in January 1991. That picture he painted in 1989, the last time he had any contact with Andreina, was not that of the woman in 1991, who did not seem to "understand the best interests of her child," who would receive her child "without any kind of nurturing or warm response" or who "could become violent towards [Andrew] if he expressed positive feelings toward [Robert]."

Parenthetically we note that Robert has argued that Podolner's opinion of the parenting skills of Robert was relevant because the

judge had to decide who would get "possession" of Andrew. That argument is the best argument for the admissibility of Dean Graham's testimony.

One final observation about Podolner's testimony. On October 2, 1989, Andreina filed a *pro se* response to a petition for a rule to show cause in which she alleged the following:

> "Mr. Podolner of Hephzibath suggested to the parties' attorneys that supervision was not necessary any further and that the Petitioner [Andreina] has accepted that decision. *The Respondent [Robert] has spent a lot of time in conference with Mr. Podolner trying to convince him to help him in court and to testify in his favor, so he could obtain what he wants. Mr. Podolner has taken a personal interest in advising the Respondent and in aiding him to achieve his interests.* Mr. Podolner and the Respondent have exchanged their respective home phone numbers and they address each other as Mark and Bob, respectively. Mr. Podolner has stepped out of the realm of objective intervention and evaluation in this case and has invalidated his stance as an impartial observer in this case." (Emphasis added.)

Andreina was prescient. Robert called Podolner 14 months after Andreina made those remarks and did indeed get him "to help [Robert] in court" and to testify "in his favor so [Robert] could obtain what he wants"—custody of Andrew. Robert now may be willing to jettison Podolner as harmless error, but he must acknowledge that in the trial court Podolner earned his money.

Finally, we turn to the question of the sufficiency of the evidence. But first, it is necessary to set out the standards for review. We are fully aware of those most basic rules of appellate law that the credibility of the witnesses and the weight to be given their testimony is for the trier of fact and that a reviewing court may not substitute its judgment for that of the fact finder. It is also a rule of appellate law, however, that, while a reviewing court may not try a case *de novo*, it must determine whether a judgment is against the manifest weight of the evidence. (*In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 485 N.E.2d 367.) In addition, the rule that a reviewing court is precluded from considering the credibility of witnesses is not absolute. (See *Jones v. Consolidation Coal Co.* (1988), 174 Ill. App. 3d 38, 528 N.E.2d 33, citing *People v. Bierman* (1987), 163 Ill. App. 3d 256, 516 N.E.2d 963.) The trier of fact must, as a matter of law, reject testimony which is so inherently improbable as to be contrary to the com-

mon experience of mankind. *Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 438 N.E.2d 1217.

■■■ Even if we accepted that the proper standard of proof is only a preponderance of the evidence, Robert must prove that it is more probably true than not true that Andreina was guilty of such acts of physical abuse against Andrew that she forfeited her right to custody of Andrew. In determining whether Robert has maintained his burden of proof, all of the evidence should be considered. *In re Marriage of Edsey* (1990), 199 Ill. App. 3d 39, 556 N.E.2d 552.

■■■ Certain things are undisputed. Andrew did have lacerations over the eye and ear, a cracked tooth and split lips, and Andrew did manifest feelings against his mother when he would return from visitation from Robert.

Let there be no mistake about Robert's position when he filed his petition for a protection order and testified at the *ex parte* hearing and the subsequent hearing: He was trying to convince the judge that the cracked tooth, the lacerations over the eye and ear and the split lips were the results of maternal brutality and that Andrew was terrified of a cruel mother. We make this observation because of what we perceive to be an edging away by Robert from his position in the trial court. He now seems to suggest that Andreina may have been guilty of psychological, rather than physical abuse, or that Andreina may have been neglectful. He has not, however, expressly withdrawn his claim that she was guilty of physical abuse.

After Andreina was given the right to present evidence, which she should have been given in the first place, she proved that she did not cause the lacerations over the eye and ear, the cracked tooth or the split lips. We now know from the testimony and medical records in evidence that Robert was aware of the laceration over the eye in January 1990, six months before he allegedly noticed a change in Andrew's behavior. He did not inform the trial judge at the *ex parte* hearing of all the circumstances of the laceration over the eye that had occurred around January 1990. He was also aware, and did not inform the judge at the *ex parte* hearing, that the injury occurred while Andrew was in the care of his maternal grandparents. We now know that Robert took Andrew with Andreina to the pediatric dentist of Robert's choosing when Robert became aware of the cracked tooth. Robert did not tell the judge that he had taken Andrew to a dentist.

Robert said that Andrew had a laceration on his ear about five or six months before he testified in February 1991. He did not talk to Andreina about it. He put some ointment on it.

Andreina's mother testified to a mosquito bite on Andrew's ear to which an antibiotic, provided by her husband, was applied. Her husband corroborated her testimony. That testimony was also corroborated by Karen Hogan, who remembered that Andreina brought some ointment for a bug bite on Andrew's ear which Hogan applied to the ear.

Andreina also established by proof which included testimony from disinterested witnesses (and even Podolner's letter in November 1989) that she had a loving relationship with her son. Disinterested witnesses also testified to a lack of bruises on Andrew. We will discuss the testimony about Andrew's split lips when we address the question of credibility of Robert, but we will first revert to the December 2, 1990, occurrence.

Robert testified that after Andreina told Andrew to be quiet, her face became red, and "she got this blank expression on her face, and she punched him twice in the head with her fist—a full swing." Andrew was stunned; he continued to cry and reach for Robert. (In his affidavit, Robert said that Andreina had punched Andrew in the face. He also said in the affidavit that Andreina pulled Andrew's hair; he never testified that she pulled his hair.)

Eunice Gordon testified that, as she looked through a glass door, she was able to see that Andreina's face turned "real red" and that Andreina punched Andrew once in the *cheek*, and then "patted" him on the back. Eunice said that Andrew let out a scream. She added, "It sends chills down me when I think of it. *** The scream was so loud that, if there was talking, it drowned it out." Robert did not testify to any scream by Andrew. As noted, according to Officer Jones, Eunice had told him that she did not see anything.

Obviously, there are differences between the testimony of Robert and his mother, whose testimony was seriously impeached. Andreina denied striking Andrew; she said that she took him into the stairwell. Robert and his mother denied that Robert went into the stairwell. Andreina's testimony is corroborated by a disinterested witness, Barbara Wilson, who not only testified that she recovered Andrew's yellow blanket on the landing of the stairwell but also testified that she thought the argument was in her hallway on the second floor. She was alarmed because the argument "was so close." That testimony also corroborated Andreina's testimony that the argument occurred in the stairwell and not in the lobby, which is separated from the stairwell by a door that is always closed. Wilson never heard a child scream.

Against the background of the differences between the testimony of Robert and his mother and the testimony of Andreina, we must consider the improbabilities of their testimony. It is improbable that Andreina would strike her child in the presence of Robert, who she knew was anxious to get custody of Andrew from her; it is improbable that a mother who was abusing her child would call the police on December 13 and later take the child to the hospital to determine the cause of what appeared to be a puncture wound on his buttocks; and it is improbable that an abusive mother would take her child to someone like Dr. Mather in an attempt to find out why her child's behavior had changed. Most important, it is more improbable that a young mother, who for 2½ years always displayed tenderness and love to her only child, would suddenly became an ogress.

Robert's testimony is inherently improbable in another significant aspect. He testified at the *ex parte* hearing that the first time after December 2 he noticed a split lip on Andrew, Andrew told him that his mommy hit him. His affidavit identified that date as December 8, the day he took the videotape of Andrew. He returned Andrew to Andreina without protest. Robert testified at the *ex parte* hearing that he again saw a split lip on Andrew about two weeks later. His affidavit identified that date as December 22, 1990. Again Andrew told him that his mother hit him; and again Robert returned Andrew to Andreina without protest. He testified that the lacerations on Andrews lip were "fairly large." In one case it was "two centimeters to two and one-half centimeters and with a large amount of swelling so that it was like he had a grape or a large grape under his lip."

Robert, it is most important to note, is a physician, who surrendered his child to Andreina on December 2, 1990, because, he said, he felt that she would be too afraid to do anything further to Andrew. He said that the police had told Andreina that if she did any further wrong to Andrew she would go to jail. And yet, if his testimony is to be believed, he did nothing when he learned that she was not afraid of the police and had physically abused Andrew again. He did not notify the police or the DCFS. In fact, he avoided the DCFS. Most of all, he surrendered his son to a woman who apparently had not learned her lesson. The brutality did not end on December 8 either. She allegedly physically abused Andrew again on December 22; and again Robert said nothing to anyone, not even his sister. (Janice testified that she never discussed Andrew's split lips with Robert.)

Robert, who was preparing for litigation as evidenced by his use of the videotape at the instruction of his lawyer, did not take pictures of the injury to Andrew's lip or seek any corroboration of Andrew's

complaint to him. And for the third time he surrendered his son to the woman he must have assumed would continue to brutalize him. All this without a word of protest by Robert to anyone. Moreover, he was willing to have Andreina take Andrew away for a week, and he was willing to go to Disney World with Andrew and the woman he believed continued to physically abuse his son. In our judgment, Robert's testimony is so inherently improbable on this point that it seriously undermines his credibility in general. In addition, Podolner, who allegedly saw Andrew on December 8 or 9, apparently did not see any split lip. Dr. Ciskowski examined Andrew on December 20 and, we infer, saw no injuries to Andrew's lips. Last, we have closely reviewed the videotape of December 8 and 9. We were unable to detect any injury to Andrew's lips. The statement in Andreina's brief that the tape does not disclose a split lip on Andrew is unchallenged by Robert. Several witnesses, including Andreina, testified that Andrew had an overbite and that he sometimes injured his mouth when he fell.

Robert's attorney conceded that there was no direct evidence to establish that Andreina had caused bruises, lacerations over the eye and ear, the cracked tooth or split lips. There is no circumstantial evidence that would support a finding that she had done so either.

We turn now to the testimony of Officer Jones that Andrew said, "Mom hit me," and indicated by touching his head. Andreina maintained that that testimony (as well as Robert's testimony of what Andrew told him) was inadmissible. We need not decide whether it is admissible. We will treat it as though it was.[3]

In the videotape taken by Robert on December 8, less than two hours after Andrew had been picked up at Andreina's, the dialogue between them begins with Robert asking what his mother did to him; Andrew responded by making several patting motions with his hand directed toward his head and face. Robert asked the question again, and Andrew did not answer; his interest was diverted by a toy gun which he picked up. What we find difficult to believe is that three-year-old Andrew would remember on December 8 what had happened on December 2 without any off-camera reference by Robert to December 2.

The videotape of December 9 shows Andrew being asked repeatedly by Robert, and once by Robert's mother, why he did not like

---

[3]Robert's attorney told the judge that he was not introducing the statements Andrew allegedly made to Robert to establish the truth of the statements.

Mommy. Many times Andrew did not answer, but once he answered that Mommy was "stupid." In the audiotape taken by Andreina after Andrew returned from visitation with Robert, Andrew told his mother that she was "stupid." In response to questions, he said that Robert had said bad things about Andreina, including the fact that she was "stupid." The point of all this is that an inference may be drawn that Andrew, like almost all three-year-old boys, is reasonably impressionable and that Robert was not above impressing him. Even assuming the admissibility of Andrew's statement to Jones, it is entitled to minimal weight.

The tape taken on December 9 was designed to establish by pictorial evidence that Andrew was terrified of being returned to his mother. He does not appear terrified to us; he appears very angry. (He appears the same way on the audiotape.) In fact, he told Robert to "go away," and to "leave [him] alone." On two occasions he kicked at Robert.[4] He was lying on the floor, rubbing his eyes and manifesting a very angry mood. We see a picture of a cranky, overtired, three-year-old boy, a very common picture. As we have said, he was repeatedly asked by Robert why he did not like Mommy. Our impression of Robert in the taking of that tape is not favorable to him. It represented child-baiting to us. Robert verbally poked and provoked a tired little boy in an attempt to have him say something unfavorable about his mother. If what occurred on December 9 was typical of what occurred on other occasions when Andrew was to be returned to his mother, it is small wonder that he manifested such ill-feeling toward his mother. It is significant that he also expressed ill-feeling toward Andreina's mother, identified as "Nona." There is no suggestion that "Nona" ever mistreated Andrew.

The audiotape taken by Andreina corroborates her testimony that Andrew would be very difficult to deal with when he first came home after visitation with Robert but would eventually calm down. That is precisely what the audiotape of December 13 revealed.

■■ When we consider the obvious interest of Robert, his contrary statements, his previous unsuccessful attempts to gain custody, his refusal to cooperate with DCFS and his inherently improbable testimony concerning injuries to Andrew after December 2, and we weigh it against all the other evidence, we must conclude that his testimony is insufficient, as a matter of law, to establish by a preponder-

---

[4]When Andrew was in Dr. Mather's office he hit Robert with his hand; he hit him in the face with a toy helicopter and threw toys at him.

ance of the evidence physical abuse of Andrew by his mother. The position we take is consistent with the position taken by the supreme court in the landmark case of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, in which the court pointed out the weaknesses of the testimony of the plaintiff's witnesses. It described the plaintiff's evidence as "highly equivocal" and of "dubious probative value." (*Pedrick*, 37 Ill. 2d at 511.) The court concluded, as a matter of law, that all of the evidence, viewed most favorably to the plaintiff, so overwhelmingly favored the defendant that no contrary verdict based on the evidence could ever stand. We so conclude in this case.

It is appropriate that we also discuss the testimony of Dr. Helding. In arguing the sufficiency of the evidence, Robert's attorneys tell us that "Dr. Helding further opined that the trauma by Andreina consisted of physical mistreatment with psychological injury." That statement is disturbingly misleading and once again is also diametrically opposite to the position taken by Robert in the trial court. Robert's attorney told the judge, "I don't think that the witness, Dr. Helding, has ever said that he has drawn the conclusion that there was physical child abuse."

Helding testified that he was hired to determine whether it was in the best interest of the child to be returned to his mother. He arrived at his opinion that Andrew had been "traumatized" by his mother from his observation of Andrew when told he was going to be returned to his mother. He said it was unnecessary for him to talk to Andreina to come to the conclusion he did. On direct examination, Helding testified to the history of the case that had been given to him by Robert. Robert's attorney told the judge that the history was not being offered for the truth of the statements made to Helding by Robert. It was during cross-examination by Andreina's attorney that Helding said that, *assuming the truth of what Robert told him*, a finding of physical and psychological abuse would be justified. *Helding never gave any opinion that Andrew had been physically abused.*

We have determined, as a matter of law, that Robert has failed to maintain his burden of proof and that, therefore, the judgment must be reversed on this additional ground. As we indicated before, if Robert has not proved his case by a preponderance of the evidence, it necessarily follows that he has failed to prove it by clear and convincing evidence, which, we repeat, is the proper standard of proof.

■■ We wish to make our position clear, however, that even if the evidence supported a finding that Andreina had, in fact, struck Andrew on December 2, we would still hold that that single episode

would not justify the drastic action of a change of custody. Robert relies on *In re Simmons* (1984), 127 Ill. App. 3d 943, 469 N.E.2d 215, for the proposition that evidence of one injury is sufficient evidence of abuse. *Simmons* is not factually apposite. In that case, the evidence established that the natural father had fractured the leg of his three-year-old son, among other acts of abuse. More in point is *In re Custody of Butler* (1989), 192 Ill. App. 3d 135, 548 N.E.2d 582, in which the appellate court held that spanking by a father causing bruises on his son's buttocks did not justify taking custody of a child from the father.

Under no circumstances do we mean to condone a parent punching a three-year-old child in the head. We simply say that an isolated act of excessive force exerted by a parent on a child does not necessarily justify the action of a change of custody and would not justify it in this case. As noted before, other remedies include injunction and counseling.

■■■ In summary, we hold that this judgment must be reversed because it is against the manifest weight of the evidence, because the judgment order is invalid on its face and because it is based on misuse of the Domestic Violence Act. Alternatively, we hold that errors occurred which would justify a new trial. In view of our holdings, we need not decide Andreina's argument that the judge erred in not appointing a guardian *ad litem*.

We recognize that we have raised some points not raised by the parties and have, in part, based our decision on those points.[5] We have the right to do so. The rule that points not raised by the parties are waived is a limitation on the parties, not on a reviewing court. "[T]he responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversary character of our system." (*Hux v. Raben* (1967), 38 Ill. 2d 223, 225, 230 N.E.2d 831, 832.) The facts of this case, which involves the interest of a minor child and an abuse of a mother's right to her child, demand a relaxation of the strict application of the waiver rule.

The result of our order is that Andrew will once again be wrested from a custodial parent, with whom he has lived for the past 19 months. He was three when he was taken from his mother; he is now 4½. He has seen his mother only under strict conditions of supervised

---

[5]We would still reverse on the basis of only the points raised by Andreina. The principal point she raised is that the evidence was insufficient.

visitation during that period. It is reasonable to assume that Andrew will have some difficulty adjusting to yet another change in custody. The decision we have reached this day is one we wish we had not reached. But, the stability and order of our judicial system and, more important, fundamental justice to the mother require that this judgment be reversed. What occurred in this case cannot be approved.

We take judicial notice of our own cases. The trial judge in this case later recused himself, and the case was assigned to another judge, who granted Andreina's motion to modify her visitation rights to permit her unsupervised visitation for a certain number of hours per week. Robert filed a petition for leave to appeal that order; that petition has been assigned to this division of the appellate court as a matter related to this appeal. A panel of this division, which included two of the three judges in the panel that is participating in this case, denied Robert's motion to stay the order modifying Andreina's visitation rights. The supreme court allowed Robert's motion for a supervisory order and granted the stay. As of the date of this opinion, Andreina's right to the care, custody, management and companionship of her son, more precious than a property right, has been taken from her unjustly. The sooner this wrong may be righted, the better; and if we are in error, the sooner the decision of this court may be reviewed, the better. On this court's own motion, pursuant to Supreme Court Rule 367, the time in which Robert may file a petition for rehearing is reduced from 21 days to 10 days. Any petition for rehearing must be filed in this court within 10 days after the filing of this opinion. There will be no extensions.

The judgment of the circuit court is reversed.

Judgment reversed.

McNAMARA and RAKOWSKI,* JJ., concur.

---

*Justice Rosemary LaPorta participated in oral argument prior to her death. Justice Thomas Rakowski was substituted on the panel and has listened to the oral argument tape and has read the briefs.